**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| MICHAEL BRAHAM, | : | |
| Plaintiff, | : | CIVIL CASE NO. |
| | : | 3:15-CV-1094 (JCH) |
| v. | : | |
| | : | |
| BRIAN PERELMUTER et al., | : | MARCH 26, 2018 |
| Defendants. | : | |
| | : | |

**RULING RE: MOTION FOR SUMMARY JUDGMENT (DOC. NO. 170)**

**I. INTRODUCTION**

Plaintiff Michael Braham ("Braham") brings this action against Susan O'Loughlin ("O'Loughlin"), Dr. Brian Perelmuter, Dr. Johnny Wu, Commissioner Scott Semple, and Health Services Administrator Brown for a delay in providing him with dental care in violation of the Eighth Amendment. The court granted in part and denied in part a Motion for Summary Judgment brought by Dr. Perelmuter, Dr. Wu, Commissioner Semple, and Administrator Brown. (Doc. No. 166). O'Loughlin has now moved for summary judgment. (Doc. No. 170). For the reasons that follow, O'Loughlin's Motion for Summary Judgment is granted.

**II. FACTUAL BACKGROUND**

A. <u>The System for Inmate Patient Specialty Services</u>

The Department of Correction ("DOC") and Correctional Managed Health Care ("CMHC") at UConn Health have an agreement in which CMHC employees are hired to provide dental care to inmate patients in the custody of the Commissioner of the DOC. Defs.' Local Rule 56(a)(1) Statement of Material Facts in Supp. of Summ. J. ("Def.'s L.R. 56(a)1") (Doc. No. 170-2) at 1 ¶ 3; Pl.'s Local Rule 56(a)(2) Statement ("Pl.'s L.R. 56(a)2") (Doc. No. 182-2) at 1–2 ¶ 3. Routine dental treatment, such as fillings,

1

extractions, or removable dentures, are typically provided to inmate patients within the facility by CMHC-employed providers.  Def.'s L.R. 56(a)1 at 2 ¶¶ 5–6; Pl.'s L.R. 56(a)2 at 2 ¶¶ 5–6.  When a CMHC dental provider determines that an inmate patient requires specialty services, the provider submits a request on behalf of the inmate patient to the Utilization Review ("UR") committee on a UR request form.  Def.'s L.R. 56(a)1 at 2 ¶ 7; Pl.'s L.R. 56(a)2 at 3 ¶ 7.

The provider assigns a priority to the request.  Def.'s L.R. 56(a)1 at 2 ¶ 8; Pl.'s L.R. 56(a)2 at 3 ¶ 8.  Priority 1 is an emergency that requires the requester to contact oral surgery for immediate approval; Priority 2 signifies that the request is urgent and should be treated within one week; Priority 3 indicates that care should be provided within three weeks; Priority 4 is routine treatment that should be done within two months; and Priority 5 is routine treatment that should be done within two to 13 months. Id.  After reviewing the request, the UR committee, comprised of Dr. Richard Benoit, the Director of Dental Services, approves or denies it.  Def.'s L.R. 56(a)1 at 3 ¶ 11; Pl.'s L.R. 56(a)2 at 4 ¶ 11.  Dr. Benoit also approves or amends the provider's recommended prioritization.  Pl.'s L.R. 56(a)2 at 4 ¶ 12.

The parties dispute the scheduling process in effect during the times relevant to the instant case.  According to O'Loughlin, once approved, requests were printed from the Utilization Review System on an outstanding appointment list, which could number over 20 pages.  Def.'s L.R. 56(a)1 at 3 ¶¶ 14–15.  The UR schedulers at CMHC faxed the list to the School of Dental Medicine and the School of Dental Medicine responded with appointment dates and times.  Id. at 3 ¶ 16.  Subsequently, Dr. Benoit reviewed the appointment requests to ensure that inmate patients who required prompt care were

scheduled for treatment.  Id. at 4 at ¶ 25.  The UR scheduler then booked inmates to available appointments based on their priority classification.  Id. at 3 ¶ 13.

According to Braham, the process O'Loughlin described for scheduling inmate patient appointments is the current process, not the system in place during at least a portion of the time period during which Braham's treatment was delayed.  Pl.'s L.R. 56(a)2 at 4 ¶ 13; Pl.'s L.R. 56(a)2, Additional Material Facts at 23 ¶ 7.  In "early 2014," when OMF received the fax with the outstanding appointment list, which included Braham beginning on March 10, 2014, the OMF clerks assigned the inmate patients to available appointments on a "first come, first served basis."  Pl.'s L.R. 56(a)2, Additional Material Facts at 24 ¶ 15.  Although the appointment list contained CMHC's priority designation, the OMF clerks did not use the number system, which they believed were security ratings, when filling appointment slots.  Id. at 25 ¶¶ 17–18.

### B.  Defendant O'Loughlin's Role

O'Loughlin has worked for the UConn Health Center as a registered nurse since 1990 and currently works for the School of Dental Medicine, Department of Oral Maxillofacial Surgery ("OMF") as a Clinical Nurse 3 and an Assistant Nurse Manager. Def.'s L.R. 56(a)1 at 4 ¶ 30; Pl.'s L.R. 56(a)2 at 8 ¶ 30.  In the first several years in her positions, O'Loughlin's responsibilities consisted of providing care to patients directly and scheduling post-operating room ("OR") appointments.  Def.'s L.R. 56(a)1 at 5, 7 ¶¶ 31–33, 46; Pl.'s L.R. 56(a)2 at 8–9, 13 ¶¶ 31–33, 46.  When the faxed appointment request list arrived at OMF, O'Loughlin separated the cases that she booked for post-operative OR appointments and wrote "post-op" on the list with the name of the doctor who had operated on the patient.  Pl.'s L.R. 56(a)2, Additional Material Facts at 24 ¶ 13. She then gave the rest of the list to the OMF clerks, who plugged in the appointment

requests with available providers on a "first come, first served" basis. Id. at 24 ¶¶ 14–15. Apart from the faxed list, O'Loughlin occasionally learned of a request for OMF services through telephone calls from CMHC requesting emergency service. Def.'s L.R. 56(a)1 at 5–6 ¶ 34; Pl.'s L.R. 56(a)2 at 9–10 ¶ 34.

Soon after becoming the assistant nurse manager at OMF in 2010, O'Loughlin became aware that appointment requests for specialty service treatment were frequently delayed because the number of requests for elective services far exceeded the availability of the dental providers at OMF. Def.'s L.R. 56(a)1 at 6 ¶ 37; Pl.'s L.R. 56(a)2 at 10–11 ¶ 37; Pl.'s L.R. 56(a)2, Additional Material Facts at 25 ¶ 19. O'Loughlin became aware of the backlog when she got calls from CMHC asking her what was happening or what she could do. Pl.'s L.R. 56(a)2, Additional Material Facts at 25 ¶ 21. When O'Loughlin asked the clerks if they were making any progress with the list, their response was that they were not. Id.

As a result, O'Loughlin volunteered to review the scheduling of all appointment requests. Def.'s L.R. 56(a)1 at 6 ¶ 39; Pl.'s L.R. 56(a)2 at 11 ¶ 39; Pl.'s L.R. 56(a)2, Additional Material Facts at 25–26 ¶¶ 22–23. CMHC's priority designation for each appointment request was contained on the faxed list, but it did not enter into the decision-making process of O'Loughlin or the clerks. Pl.'s L.R. 56(a)2, Additional Material Facts at 24–25 ¶¶ 16–18.

Due to the backlog of requests for specialty service appointments and the amount of time O'Loughlin was spending assisting the clerks in providing dates for appointment requests with the appropriate department and dental providers, O'Loughlin requested that a meeting be held. Def.'s L.R. 56(a)1 at 8 ¶ 48; Pl.'s L.R. 56(a)2 at 13 ¶

48.  At the meeting, O'Loughlin, Dr. David Shafer, the head of OMF, Dr. Stephen

Lepowsky, the Dean of Academic and Student Affairs at UCONN School of Dental

Medicine, Dr. Benoit, and Erica Roman, Administrative Program Coordinator at CMHC,

discussed how the process could be handled more efficiently to alleviate the backlog.

Def.'s L.R. 56(a)1 at 8 ¶¶ 48–49; Pl.'s L.R. 56(a)2 at 13–14 ¶¶ 48–49; Richard Benoit

Depo. (Nov. 15, 2017), Ex. 1 to Pl.'s Obj. to Def.'s Mot. for Summ. J. (Doc. No. 182-3) at

53; Affidavit of Erica Roman ("Roman Aff."), Ex. 2 to Def.'s L.R. 56(a)1 at 1 ¶ 2.  After

the meeting, several changes to the process for scheduling inmates went into effect:

O'Loughlin communicated the provider availability to CMHC; Dr. Benoit chose the

patients that would be filled into O'Loughlin's oral surgery schedule; the roster was

separated according to specialty; and OMF began consulting with and treating patients

on the same day, if appropriate.  Pl.'s L.R. 56(a)2, Additional Material Facts at 29 ¶ 37.

There is nothing in the record as to who had the authority to implement these changes.

    C.  Braham's Delay in Treatment

On January 21, 2014, Braham was seen by Dr. David Sochacki, a CMHC dentist,

for generalized complaints of sensitivity at or near the location of the lower wisdom

teeth.  Def.'s L.R. 56(a)1 at 3 ¶ 17; Pl.'s L.R. 56(a)2 at 5 ¶ 17, Benoit Depo. at 30–31.

Dr. Sochacki determined that Braham's lower wisdom teeth were impacted—a condition

in which neighboring teeth block the wisdom teeth from erupting into the mouth—and

recommended oral surgery for the extraction of the impacted wisdom teeth.  Def.'s L.R.

56(a)1 at 3 ¶ 18; Pl.'s L.R. 56(a)2 at 5 ¶ 18.  On February 25, 2014, Dr. Peter O'Shea, a

different CMHC dentist, examined Braham, concurred with Dr. Sochacki's

recommendation of surgical extraction of Braham's lower wisdom teeth, and prepared

and submitted a request for off-site specialty service at UConn Health Center.  Def.'s

L.R. 56(a)1 at 4 ¶¶ 19–20; Pl.'s L.R. 56(a)2 at 6 ¶¶ 19–20; Benoit Depo. at 32.  The surgical request indicated that the last panoramic film taken of Braham was in 2001 and that he had "mesioangular impacted 17 and 32.  High caries risk."[1]  Def.'s L.R. 56(a)1 at 4 ¶ 21; Pl.'s L.R. 56(a)2 at 6 ¶ 21.  Dr. O'Shea gave the request a Priority 4, meaning that it should be treated within two months.  Def.'s L.R. 56(a)1 at 4 ¶ 22; Pl.'s L.R. 56(a)2 at 6 ¶ 22.  The request was approved on March 10, 2014.  Def.'s L.R. 56(a)1 at 4 ¶ 23; Pl.'s L.R. 56(a)2 at 6 ¶ 23.

After February 2014, Braham experienced swelling, bleeding from infections in the pockets between his impacted wisdom teeth and his secondary molars, soreness, and terrible breath.  Def.'s L.R. 56(a)1 at 9 ¶ 60; Pl.'s L.R. 56(a)2 at 16 ¶ 60.  On February 14, 2015, Braham, still waiting for his surgical extraction, was summoned by Dr. Perelmuter for an examination.  See Michael Braham Depo. (Apr. 6, 2016), Ex. 4 to L.R. 56a(1) (Doc. No. 170-6) at 32.  That same day, Dr. Perelmuter cancelled the request for oral surgery and recommended an alternative treatment plan to address Braham's dental needs.  Def.'s L.R. 56(a)1 at 5 ¶ 27; Pl.'s L.R. 56(a)2 at 7–8 ¶ 27.

On July 29, 2015, after being alerted to a pending legal action, Dr. Benoit examined Braham and determined that extraction of Braham's lower wisdom teeth remained the appropriate treatment.  Def.'s L.R. 56(a)1 at 11 ¶ 71; Pl.'s L.R. 56(a)2 at 19 ¶ 71.  Although Dr. Benoit did not believe that treatment was "emergent," he contacted O'Loughlin and requested an expedited appointment for Braham to be treated

---

[1] According to Dr. Benoit, "high caries risk" means that there was a high likelihood of decay due to food getting stuck between Braham's wisdom teeth and his neighboring teeth.  Benoit Depot. at 67–68. "Mesionagular impacted" means that the wisdom teeth were leaning towards the front of the mouth, rather than towards the jaw.  Id. at 68

by an OMF surgeon. Def.'s L.R. 56(a)1 at 11 ¶ 72–73; Pl.'s L.R. 56(a)2 at 19 ¶¶ 72–73. Braham's surgery was performed on August 14, 2015. Def.'s L.R. 56(a)1 at 11 ¶ 74; Pl.'s L.R. 56(a)2 at 19–20 ¶ 74.

O'Loughlin does not recall the date Braham's name began to appear on the appointment request list or the type of specialty service requested. Def.'s L.R. 56(a)1 at 9 ¶ 54; Pl.'s L.R. 56(a)2 at 15 ¶ 54. O'Loughlin testified that she first became aware that Braham required an immediate appointment for extraction of his wisdom teeth when Dr. Benoit contacted her in July 2015. Def.'s L.R. 56(a)1 at 9 ¶ 58; Pl.'s L.R. 56(a)2 at 16 ¶ 58.

## III. LEGAL STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 71–72 (2d Cir. 2016). Once the moving party has met its burden, in order to defeat the motion, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 256, and present "such proof as would allow a reasonable juror to return a verdict in [its] favor," Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "An issue of fact is genuine and material if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Cross Commerce Media, Inc. v. Collective, Inc., 841 F.3d 155, 162 (2d Cir. 2016).

In assessing the record to determine whether there are disputed issues of material fact, the trial court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." LaFond v. Gen. Physics

Servs. Corp., 50 F.3d 165, 175 (2d Cir. 1995). "Where it is clear that no rational finder of fact 'could find in favor of the nonmoving party because the evidence to support its case is so slight,' summary judgment should be granted." F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994)). On the other hand, where "reasonable minds could differ as to the import of the evidence," the question must be left to the finder of fact. Cortes v. MTA N.Y. City Transit, 802 F.3d 226, 230 (2d Cir. 2015) (quoting R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997)).

## IV. DISCUSSION

### A. Eleventh Amendment

In addition to seeking monetary damages against O'Loughlin in her individual capacity, Braham seeks a declaratory judgment against her. See 2d. Am. Compl. at 1, 16. O'Loughlin argues that the Eleventh Amendment bars any claims for declaratory relief because she is not being sued in her official capacity and the relief Braham seeks cannot be characterized as prospective, as required for a claim to fall under the exception to the Eleventh Amendment set out in Ex Parte Young, 209 U.S. 123 (1908). See Def.'s Mem. at 7.

Braham concedes that the Eleventh Amendment bars his claims for declaratory relief against O'Loughlin. See Pl.'s Mem. at 5. O'Loughlin's Motion for Summary Judgment is granted as to the request for declaratory relief.

### B. Eighth Amendment

The Supreme Court has held that deliberate indifference by prison officials to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 104 (1976). The

Second Circuit has applied the deliberate indifference standard set forth in Estelle to claims of denials or delay in the treatment of dental needs.  See Harrison v. Barkley, 219 F.3d 132, 136–37 (2d Cir. 2000) (applying Estelle to claim of untreated tooth cavity); Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (applying same standard, where plaintiff claimed prison dentist failed to properly treat severe tooth decay).  There are subjective and objective components of this Eighth Amendment claim.  See Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006).

First, as to the objective prong of the test, the alleged deprivation of medical care must be "sufficiently serious."  See id. at 279 (quoting Farmer, 511 U.S. at 834)).  A "sufficiently serious" deprivation exists if the plaintiff suffers from an urgent medical condition that is degenerative or is capable of causing death or extreme or chronic pain. See Brock v. Wright, 315 F.3d 158, 162–63 (2d Cir. 2003) (citation omitted); Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996) (citations omitted).  A medical or dental condition may not initially be serious, but may become serious because it is degenerative and, if left untreated or neglected for a long period of time, will "result in further significant injury or the unnecessary and wanton infliction of pain."  Harrison, 219 F.3d at 136–37 (citations omitted).  The Second Circuit has identified several factors that are "highly relevant" to the question of whether a medical condition is sufficiently serious, including: "an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."  Chance, 143 F.3d at 702 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059–60 (9th Cir. 1992)).

As for the subjective prong, the defendant prison official must have "act[ed] with a sufficiently culpable state of mind." Id. (quoting Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994)). Thus, the defendant must have been "actually aware of a substantial risk that serious inmate harm will result" as a result of his or her actions or inactions and have disregarded that risk. See Salahuddin, 467 F.3d at 279–80. The fact that a prison official did not alleviate a significant risk that he should have, but did not, perceive does not constitute deliberate indifference. See Farmer, 511 U.S. at 838.

Furthermore, a showing of negligence or medical malpractice does not support an Eighth Amendment claim, unless it involves culpable recklessness. See Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003). Thus, "not every lapse in prison medical care will rise to the level of a constitutional violation." See Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003) (citing, inter alia, Estelle, 429 U.S. at 105–06). In certain situations, however, "instances of medical malpractice may rise to the level of deliberate indifference[,] namely, when the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces a conscious disregard of a substantial risk of serious harm." Hathaway, 99 F.3d at 553 (internal quotation marks and citation omitted).

1.    Objective Prong: Serious Dental Need

O'Loughlin concedes for the purposes of summary judgment that the delay in treatment for Braham's dental needs meets the objective prong of an Eighth Amendment deliberate indifference claim. See Def.'s Mem. of Law in Supp. of Summ. J. ("Def.'s Mem.") (Doc. No. 170-1) at 10.

2. Subjective Prong: Deliberate Indifference

O'Loughlin argues that there is no evidence that she was aware of a serious risk to Braham's health and that she consciously disregarded that risk. See Def.'s Mem. at 12. Braham argues that there is sufficient evidence for a reasonable jury to find that O'Loughlin was aware of a backlog of inmate elective appointment requests, reviewed the appointment list containing Braham's request, and failed to properly categorize Braham's appointment or ensure that it was scheduled in accordance with CMHC's priority designation. See Pl.'s Mem. of Law in Supp. of Obj. to Def.'s Mot. for Summ. J. ("Pl.'s Mem.") (Doc. No. 182-1) at 10.

Resolving ambiguities in favor of Braham for purposes of deciding the Motion for Summary Judgment, the evidence shows that, in 2014, O'Loughlin and the clerks at OMF were responsible for assigning inmate patients to appointments. See Susan O'Loughlin Depo. (Nov. 6, 2017), Ex. 2 to Pl.'s Obj. to Def.'s Mot. for Summ. J. (Doc. No. 182-4) at 31–32, 35–36. However, Braham has not raised a disputed issue of material fact as to whether O'Loughlin was aware of the risk to Braham's health from the delay in his treatment. O'Loughlin testified that she did not recall seeing Braham's name on the appointment list or speaking with any of the clerks about Braham. See O'Loughlin Depo. at 41. O'Loughlin and the clerks at OMF did not know that the numbers on the requests signified the level of urgency to obtain treatment; rather, they assumed the numbers represented the inmate patients' security designations. See Pl.'s L.R. 56(a)2, Additional Material Facts at 24–25 ¶¶ 16–18. While O'Loughlin's incorrect assumption about the meaning of the numerical rankings may possibly have been

negligent, deliberate indifference requires that the defendant have actually been aware of a substantial risk of harm. See Salahuddin, 467 F.3d at 280.

Braham argues that, even if O'Loughlin was not aware of a risk to Braham's health in particular, she is still liable for inadequate scheduling practices, which led to the delay in Braham's treatment, through her action or inaction as a supervisor in OMF. See Pl.'s Mem. at 10. Braham argues that O'Loughlin had supervisory authority over the scheduling of inmate elective procedures and that she was aware of systematic deficiencies in the scheduling of elective inmate procedures, which resulted in the patient backlog and the long delay in Braham's treatment. See id. at 12.

To recover money damages under section 1983 of title 42 of the United States Code, Braham must show that O'Loughlin was personally involved in constitutional violations. See Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). "A prison official cannot be personally liable under § 1983 on the basis of respondeat superior or simply because he is atop the prison hierarchy." Lewis v. Cunningham, 483 F. App'x 617, 618–19 (2d Cir. 2012) (summary order) (citing Colon v. Coughlin, 58 F.3d 865, 874 (2d Cir. 1995)).

For many years, "[i]t was well settled in this circuit that there were five ways to demonstrate the personal involvement of a supervisory defendant," Dupas v. Arnone, No. 3:12–cv–1215 (AVC), 2012 WL 4857565, at *2 (D. Conn. Oct. 10, 2012), namely that:

> (1) the defendant participated directly in the alleged constitutional violation,
> (2) the defendant, after being informed of the violation through a report or appeal,
> failed to remedy the wrong, (3) the defendant created a policy or custom under
> which unconstitutional practices occurred, or allowed the continuance of such a
> policy or custom, (4) the defendant was grossly negligent in supervising
> subordinates who committed the wrongful acts, or (5) the defendant exhibited
> deliberate indifference to the rights of inmates by failing to act on information
> indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citation omitted). In addition,

plaintiffs were required to demonstrate an affirmative causal link between the action or

inaction of the supervisory official and their alleged injuries. See Poe v. Leonard, 282

F.3d 123, 140 (2d Cir. 2002).

However, in Ashcroft v. Iqbal, the Supreme Court discussed supervisory liability,

stating that a supervisor can be held liable only "through the official's own individual

actions." See 556 U.S. at 676. Although this decision arguably casts doubt on the

continued viability of some of the categories for supervisory liability set forth in Colon,

the Second Circuit has not revisited the Colon criteria since Iqbal. See Raspardo v.

Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of

the supervisory liability test, including the gross negligence prong, after Iqbal." (citations

omitted)); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (suggesting

that decision in Iqbal "may have heightened the requirements for showing a supervisor's

personal involvement with respect to certain constitutional violations," but finding it

unnecessary to reach impact of Iqbal on personal involvement requirements in Colon);

Shaw v. Prindle, 661 F. App'x 16, 18 & n.2 (2d Cir. 2016) (summary order) (same).

Because it is unclear whether, or to what extent, Iqbal overrules or limits Colon, this

court will apply the categories for supervisory liability set forth in Colon, as have several

other courts in this District. See, e.g., Boyd v. Arnone, 48 F. Supp. 3d 210, 218

(D. Conn. 2014); <u>Friedland v. Otero</u>, No. 3:11–cv–606 (JBA), 2014 WL 1247992, at *10 (D. Conn. Mar. 25, 2014).

Braham points to O'Loughlin's involvement in reviewing the appointment list and organizing a meeting to alleviate the backlog problem as evidence that she had a supervisory role in scheduling inmate procedures.  <u>See</u> Pl.'s Mem. at 12.  Braham has not indicated which <u>Colon</u> factor supports his argument that O'Loughlin is liable in her role as a supervisor.  <u>See id.</u> at 10–14.  However, the evidence that Braham relies on regarding O'Loughlin's control of the scheduling process does not create a genuine issue of material fact that O'Loughlin was responsible for the delay in scheduling under any of the theories of supervisory liability in <u>Colon</u>.

Absent evidence that O'Loughlin was aware of a substantial risk of harm to Braham from the delay in his treatment, O'Loughlin cannot be found to be liable under the first or second <u>Colon</u> theories.  <u>See</u> <u>Colon</u>, 58 F.3d at 873.  While O'Loughlin may have seen Braham's name on the appointment list, there is no evidence in the record that O'Loughlin knew that Braham's level four prioritization meant that he should receive treatment within two months.  <u>See</u>, <u>supra</u>, at 11–12.  No reasonable jury could conclude that O'Loughlin was aware of a substantial risk to Braham's health from the length of the delay in Braham's dental care.

With respect to the third <u>Colon</u> theory, a reasonable jury could not infer that O'Loughlin's initiation of a meeting is evidence that she had the authority to change the policy for scheduling elective inmate procedures.  <u>See</u> <u>id.</u>  Braham cites <u>Sulton v. Wright</u>, 265 F. Supp. 2d 292, 300 (S.D.N.Y. 2003), in support of his argument that O'Loughlin's failure to correct defects in a system that she managed led to constitutional

violations.  See Pl.'s Mem. at 10.  However, unlike the defendant in Sulton, who was the chief medical officer responsible for managing a system for coordination of medical care for inmates, there is no evidence in the record that she had the ability or the authority to correct inadequacies in the system.

In addition, having failed to come forward with evidence that would support a jury finding that O'Loughlin herself committed a constitutional violation, see, supra, at 11–12, Braham has not put forward any further evidence to show that O'Loughlin's subordinates committed unconstitutional acts, which is required to hold a defendant liable under the fourth Colon theory.  See Colon, 58 F.3d at 873.  Indeed, there is no evidence in the record that the clerks who scheduled appointments were even O'Loughlin's subordinates.  See Def.'s L.R. 56(a)1 at 6–7 ¶¶ 39–42; Pl.'s L.R. 56(a)2 at 11–12 ¶¶ 39–42; Pl.'s L.R. 56(a)2, Additional Material Facts at 25–26 ¶ 22–24 (reflecting that, in her capacity reviewing the list of appointment requests, O'Loughlin assisted the clerks by providing them with the name of the oral surgeon who had previously operated on a patient requesting a follow-up visit or assessing whether the basis for a request signaled a potential for cancer).  While Braham argues that O'Loughlin's role "review[ing] the appointment list for accuracy" is evidence that she supervised scheduling, see Pl.'s Mem. at 12, there is no evidence that O'Loughlin did more than help out the clerks with scheduling.  See O'Loughlin Depo. at 37.

Finally, Braham also argues that the delay between 2010—when O'Loughlin became aware of the backlog—and 2014—when O'Loughlin began assisting the OMF clerks with scheduling inmate procedures other than post-operative appointments and organized the July 2014 meeting—show that she was deliberately indifferent to

systematic deficiencies in the scheduling process.  See Pl.'s Mem. at 13–14.  It is possible that O'Loughlin was negligent for continuing to schedule inmate patients on a "first come, first served" basis without reference to the urgency of the inmates' request for treatment.  However, O'Loughlin cannot be found to have been deliberately indifferent through failing to act on information indicating that unconstitutional acts were occurring under the fifth Colon theory without knowledge that she or the OMF clerks were disregarding CMHC's priority designation.  See Brock, 315 F.3d at 165 (affirming summary judgment as to a defendant who endorsed the decision of an appeals committee where there was no evidence that the members on the committee were aware that the decision they were approving on appeal did not adequately address plaintiff's medical needs).

The lengthy delay in treatment for Braham's dental needs and the larger failure of DOC and UConn Health Center to provide timely care for inmate patients is troubling.  However, Braham has not come forward with evidence upon which a reasonable jury could find that O'Loughlin was responsible for the delay he endured under Eighth Amendment jurisprudence.  Thus, Braham has not created a genuine issue of material fact that O'Loughlin was responsible for the delay in Braham's treatment or the system-wide flaws that harmed Braham.

The court concludes that O'Loughlin was not deliberately indifferent to the delay in treatment for Braham's dental needs through her direct actions or through her role as a supervisor.  The Motion for Summary Judgment on Braham's Eighth Amendment claim of deliberate indifference against O'Loughlin is granted.

C.  Qualified Immunity

Because Braham has not raised an issue of material fact that O'Loughlin violated

his constitutional rights, the court does not reach the question of qualified immunity.

## V.  CONCLUSION

O'Loughlin's Motion for Summary Judgment (Doc. No. 170) is **GRANTED**.[2]

**SO ORDERED**.

Dated at New Haven, Connecticut this 26th day of March, 2018.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge

---

[2] O'Loughlin states that she is the "remaining defendant."  Def.'s Mem. at 1.  However, the court denied defendants' Motion for Summary Judgment (Doc. No. 137) as to Braham's Eighth Amendment claim against Dr. Perelmuter.  See Ruling re: Summary Judgment (Doc. No. 166) at 41.